IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
JASPER DIVISION

LAURA ANN FRANKS,       )
                             )
      Plaintiff,        )
                             )
      v.             )     CIVIL ACTION NO. 6:09-CV-01708-KOB
                             )
MICHAEL J. ASTRUE     )
Commissioner of the Social,   )
Security Administration,     )
                             )
      Defendant.       )

**MEMORANDUM OPINION**

**I. Introduction**

The claimant, Laura Ann Franks, filed applications for a period of disability and disability insurance benefits under Title II of the Social Security Act, and an application for supplemental security income under Title XVI of the Social Security Act on September 22, 2006. The claimant alleges disability commencing on September 18, 2006, caused by cervical radiculopathy, chronic obstructive pulmonary disease, chronic pain disorder, affective disorder with depression, and mental retardation. The Commissioner denied the claims initially on December 28, 2006. On January 29, 2007, the claimant filed a timely request for a hearing before an Administrative Law Judge, and the ALJ held a hearing on May 6, 2008. In a decision dated July 31, 2008, the ALJ found that the claimant was not disabled within the meaning of the Social Security Act, and, therefore, was not eligible for disability insurance benefits. On July 10, 2009, the Appeals Council denied the claimant's request for review. The claimant has exhausted her administrative remedies, and appealed to this court. This court has jurisdiction under 42

U.S.C. §§ 405(g) and 1631(c)(3).  After effecting an appeal, the claimant filed a motion to

Remand (Doc. 8) pursuant to sentence four.

For the reasons stated below the decision of the Commissioner will be **reversed and remanded**.

## II. Issue Presented

The issue presented by the claimant is whether the ALJ failed to evaluate and consider

listing impairments 12.05(C) and 12.05 (D), mental retardation, in the five step sequential

process.[1]

## III. Standard of Review

The standard for reviewing the Commissioner's decision is limited.  This court must

affirm the Commissioner's decision if the Commissioner applied the correct legal standards and

if his factual conclusions are supported by substantial evidence.  *See* 42 U.S.C. § 405(g); *Graham

v. Apfel*, 129 F.3d 1420, 1422 (11th Cir. 1997); *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir.

1987).

"No . . . presumption of validity attaches to the [Commissioner's] legal conclusions,

including determination of the proper standards to be applied in evaluating claims.*"  Walker*, 826

F.2d at 999.  This court does not review the Commissioner's factual determinations *de novo*, but

will affirm those factual determinations that are supported by substantial evidence.  "Substantial

evidence" is "more than a mere scintilla.  It means such relevant evidence as a reasonable mind

---

[1] The claimant presents other issues on appeal, but because of the court's disposition of
the first issue, it need not address those remaining issues.

might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

The court must "scrutinize the record in its entirety to determine the reasonableness of the [Commissioner]'s factual findings." *Walker*, 826 F.2d at 999. A reviewing court must not only look to those parts of the record that support the decision of the ALJ, but the court must also view the record in its entirety and take account of evidence that detracts from the evidence relied on by the ALJ. *Hillsman v. Bowen*, 804 F.2d 1179, 1180 (11th Cir. 1986).

## IV. Legal Standard

Under 42 U.S.C. § 423(d)(1)A), a person is entitled to disability benefits when the person cannot

> engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of not less than 12 months.

To make this determination, the Commissioner employs a five-step, sequential evaluation process:

> (1) Is the person presently unemployed?
> (2) Is the person's impairment severe?
> (3) Does the person's impairment meet or equal one of the specific impairments set forth in 20 C.F.R. pt. 404, subpt. P, app.1?
> (4) Is the person unable to perform his or her former occupation?
> (5) Is the person unable to perform any other work within the economy?
>
> An affirmative answer to any of the above questions leads either to the next question, or, on steps three and five, to a finding of disability. A negative answer to any question, other than step three, leads to a determination of "not disabled."

*McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986); *see also* 20 C.F.R. §§ 404.1520, 416.920.

To "meet" a Listing, the claimant must have listed diagnosis. 20 C.F.R. §§ 404.1525(a)-(d), 416.925(a)-(d). To "equal" a Listing, medical evidence must be "at least equal in severity and duration" to the listed findings. 20 C.F.R. §§ 404/1526(a), 416.926(a). If a claimant has more than one impairment, but none meets or equals a listed impairment, the Commission determines whether the combination of impairments is medically equal to a listed impairment. *Id.*

### V. Facts

The claimant has a GED, and was thirty-nine years-old at the time of the administrative hearing. (R. 44, 130). Her past work experience includes employment as a sales clerk, cashier, stocker, and sleeve setter. (R. 136). The claimant alleges that she became unable to work on September 18, 2006, because of a disabling condition causing pain and weakness. (R. 110). At the time of her hearing she was unmarried, and had one child under the age of eighteen. (R. 111).

#### *Physical History*

On November 6, 2006, at the request of the her treating family practice physician, Dr. S. Keith Morrow, the claimant underwent MRIs on her lumbar, cervical, and thoracic spine. Dr. Donald Johnson, Radiologist, reviewed these results, and found that neither the lumbar nor thoracic MRIs revealed herniated discs or signs of spinal stenosis or fractures. These tests also showed that her invertabral discs were normal in density and height, and her spinal cord was normal. (R. 227-29, 378-80). Upon review of the cervical MRI, however, Dr. Johnson found a

4

large central herniation of the C5-C6 disc, a large central and left paracentral herniation of the C6-C7 disc, and a possible right paracentral herniation of the C4-C5 disc, all of which were causing extrinsic pressure on the spinal cord.  (R. 229, 380).

On November 21, 2006, the claimant reported to Dr. William J. Shergy, of Rheumatology Associates of North Alabama, P.C., that she was experiencing pain "from the top of her head to the bottom of her feet."  (R. 221).  She complained that every bone, muscle and joint was in pain. She further claimed she had no energy, felt "bad" when she went to bed and when she woke up, and that this pain was preventing her from working.  Dr. Shergy prescribed the claimant 75 mg of Lyrica twice a day, and recommended a bone scan to better evaluate her condition.  On November 27, Dr. Shergy conducted a NM Bone Scan of the claimant's whole body, and concluded that the results of this examination were "normal."  (R. 221-25).

Dr. Morrow referred the claimant to Dr. Benjamin Banks Fulmer of Birmingham Neurosurgery and Spine Group, PC.  Dr. Fulmer examined the claimant on November 30, 2006, and recommended an anterior cervical discectomy and fusion on the C5-6 and C6-7 vertebrae.[2] On  December 19, 2006, the claimant returned to Dr. Fulmer for a two week status post cervical discectomy and fusion.  Dr. Fulmer observed that she looked fine, her motor examination was normal, and that she was getting over her pain. (R. 263-65).

On December 28, 2006, a medical consultant/Single Decision Maker completed a Physical Residual Functional Capacity Assessment on the claimant, concluding that the claimant could occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand an/or

---

[2]The Record indicates this surgery was performed between November 30, 2006 and December 19, 2006; however, the exact date of the surgery did not appear in the medical records relevant to this treatment.

walk with normal breaks for a total of about 6 hours in an 8-hour workday; sit with normal breaks about 6 hours in an 8-hour workday, and push and/or pull for an unlimited time. As to the claimant's postural limitations, the consultant determined that the claimant could frequently perform all activities except balancing, which she could never do. The consultant found that the claimant had no manipulative, communicative, or visual limitations, and that the only environmental limitations was that she must avoid all exposure to hazards such as machinery and heights. Further, the consultant found partially credible the claimant's allegations that she is disabled because of fibromyalgia, heart murmur, syncope, and chronic fatigue. (R. 285-292).

The claimant was admitted to Russellville Hospital on September 12, 2007. She was complaining of pain in her knees and chest, and coughing. Examinations of her chest revealed that her heart and pulmonary vasculature were normal and her lungs were clear. Doctors examined both knees, but no fractures or destructive legions found. She was diagnosed with bronchitis and anxiety, and released on September 14, 2007. (R. 308-12).

The claimant underwent a series of medical tests throughout October, 2007. On October 4, 2007 a CT scan of her lumbar spine showed no evidence of fractures. A CT scan of the claimant's spine conducted on Oct. 19, 2007 revealed no abnormalities. The claimant underwent a lumbar myelogram on Oct. 19, and the results of this test were also normal. (R. 374-76).

On January 7, 2008 Dr. Morrow referred the claimant to Dr. Stephen G. Sanders. Dr. Sanders performed an MRI on the claimant's brain on Jan. 8, 2008. No abnormalities were found. (R. 407, 425).

*Mental Limitations*

On December 15, 2006, Dr. Brian Thomas, Psy. D. conducted a psychological evaluation

6

of the claimant.  Dr. Thomas found the claimant to be depressed, which he attributed to her

inability to work.  She relayed to Dr. Thomas that she had feelings of worthlessness, diminished

energy, impaired concentration, weight gain, and thoughts of death, though she denied harboring

any plans for suicide.  Dr. Thomas diagnosed her with Depressive Disorder, but ruled out Pain

Disorder associated with physical and psychological factors.  He concluded that she would have

difficulty performing routine and repetitive tasks, and that her ability to interact with coworkers

or receive supervision appeared to be poor.  He stated her improvement over the next six to

twelve months was questionable.  (R. 261-62).

On December 28, 2006, Dr. Eugene Fleece, Ph.D. completed a Mental Residual

Functional Capacity Assessment and a Psychiatric Review Technique Form.  On the MRFC, Dr.

Fleece concluded that the claimant was "markedly limited" in her ability to interact appropriately

with the general public.  Dr. Fleece found the claimant was "moderately limited" in her ability to

understand and remember detailed instructions, carry out detailed instructions, maintain attention

and concentration for extended periods, perform activities on schedule, maintain regular

attendance, work with others or in proximity to others without being distracted, complete a

normal workday and week without interruptions from psychologically based symptoms, accept

instructions and respond appropriately to supervisors, respond appropriately to changes in the

work setting, and set realistic goals.  Dr. Fleece also stated that the claimant could concentrate for

up to two hours, and work for eight hours a day if given routine breaks, but that her

psychological symptoms would cause her to miss a day of routine duties each month.  Dr. Fleece

advised that the claimant should ask for supervisory flexibility in her hours and work schedule,

and that she could adapt to changes in the work place as long as the changes were gradually

7

introduced or well-explained.  Dr. Fleece concluded that the claimant's contact with the general public during work should be eliminated.  (R. 267-70).

The Psychiatric Review Technique Form completed on this date required Dr. Fleece to evaluate the impact of the claimant's mental impairment in four functional areas: activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation.  Dr. Fleece concluded that the claimant's activities of daily living were moderately limited, her social functioning was moderately limited, and her ability to maintain concentration, persistence or pace was moderately limited.  He found no record that episodes of decompensation had occurred.  (R. 271-84).

On August 18, 2007, the claimant met with Dr. Alwyn S. Whitehead, Jr., Psy.D.  Dr. Whitehead conducted a psychological evaluation, and observed that she possessed socially appropriate mannerisms, gestures and facial expressions.  He described her speech as being normal, clear, and comprehensible.  She exhibited fair memory for immediate, recent, and remote events.  He judged her concentration to be good, her attention fair, her productivity normal, and her judgment and insight fair.  He concluded she was moderately to severely depressed, irritable, and anxious.  Dr. Whitehead observed the claimant becoming tearful periodically throughout the evaluation. (R. 300-03).

Dr. Whitehead conducted a Wechsler Adult Intelligence Scale-Third Edition (WAIS-III) that measured her verbal, performance, and full scale I.Q.  Her Full Scale I.Q. score was 71 (representing a possible score ranging from 68-78), her verbal I.Q. score was 71 (representing a possible score ranging from 67-77), and her performance I.Q. score was 76 (representing a possible score ranging from 71-84).  Based on these results, Dr. Whitehead concluded the

8

claimant may experience extensive difficulty keeping up with peers in situations that require age-appropriate thinking and reasoning abilities.  (R. 303-04).

Dr. Whitehead diagnosed the claimant with moderate to severe Chronic Major Depressive Disorder, Panic Disorder with Agoraphobia, and Borderline Intellectual Functioning.  His prognosis was "poor to fair."  (R. 304).   He concluded that, despite her impairment, the claimant could understand and remember simple instructions as well as concentrate on simple tasks.  He found her capable of engaging in limited interaction with the general public, but described her ability to interact with coworkers and/or supervisors as moderately to severely impaired.  Regarding the claimant's mental capacity, Dr. Whitehead wrote: "Ms. Franks does appear to have a life long history of mental retardation or mental slowness and is estimated to be currently performing at the Borderline range of intellectual functioning."  (R. 304-05).

Dr. Whitehead completed a Medical Source Opinion Form.  On this form he noted that her ability to respond appropriately to customers and other members of the general public was "moderately" impaired.  He stated that her ability to understand, remember and carry out detailed or complex instructions was "moderately" impaired.  He described her ability to maintain social functioning as "moderately" impaired.  (R. 306-07).

*THE ALJ HEARING*

Jack Ostrander, Administrative Law Judge, conducted a hearing in this matter on May 6, 2008.  The claimant was represented by counsel, who contended that the claimant's problems with her neck and back and her mental retardation resulted in her being totally disabled.  (R. 41-42).

The claimant testified that she worked periodically until September 2006, most recently

9

as a clerk, stocker, and cashier at Wal-Mart.  While working at Wal-Mart she experienced pain

all over, and suffered fainting spells that ultimately forced her to quit her job. She said that she

suffered muscle spasms and numbness that caused her to drop items constantly.  She admitted

not knowing what caused her symptoms, but claimed that for the past two years she experienced

pain registering as high as ten out of ten or as low as four out of ten.  Lortab and Lyrica dulled

this pain, but also made her sleepy.  (R. 42-58).  She further testified that she dropped out of

school in the 8th grade after becoming pregnant, and that she earned her GED in 2000.  She can

read, but not "big words."  (R. 58).

When asked about her daily activities, the claimant discussed her activities related to

raising her 21 year-old daughter and 15-year-old son over whom she has joint custody.  In

addition to her son, the claimant testified that she shared her home with a boyfriend, Mike, and

his two children, ages six and seven.  She stated she has trouble sleeping. She described waking

up several times throughout the night to take medication, and lying down close to five hours each

day between 8:00 am and 5:00 pm.  She visits her daughter, who lives next door, and she lies on

the couch watching TV or plays on the computer.  She leaves the house once a week, but mostly

stays at home because walking up or down the stairs from her apartment caused her pain.  In the

past year, she went fishing about once a month.  (R. 59-65).

The claimant testified that she suffers panic and anxiety attacks.  Before changing her

medication three months before the hearing, she experienced attacks once a week that lasted from

one to three minutes, but after the change in medication the attacks are less severe.  She believed

these attacks were brought on by her thinking about her current situation, her health, and how

both affected her relationship with her children and grandchildren.  She confirmed that she does

not drink alcohol or take drugs, but does smoke one pack of cigarettes each day.  Prior to her surgery in 2006, she claimed she would pass out at work, but that she has not had any black-out spells since her surgery.  (R. 52-68).

The ALJ next questioned the Vocational Expert.  The VE classified the claimant's past work as a sales associate and stocker for Wal-Mart as medium, semi-skilled, and non-transferable.  The claimant's work in the relevant period also included working as a cook and cashier, which the VE described as light, unskilled; and as a sleeve setter, classified by the VE as light, semi-skilled, with no transferable skills to sedentary.  (R. 69).

The ALJ asked the VE to assume a hypothetical person of the claimant's age, education and work experience who could do simple, not complex, tasks; maintain attention and concentration for two hours at a time; and complete a customary eight-hour day with all customary breaks.  Supervision would be nonconfrontational, and the work setting, if changed, should be changed gradually with all changes well explained.  The hypothetical person could occasionally lift and carry fifteen pounds, frequently carry ten pounds, stand and walk for six hours in an eight-hour day, and sit for six hours during an eight-hour day.  No concentrated exposure to heat, wetness, humidity, and vibration would be allowed.  This person could not work around unprotected heights, dangerous or moving equipment, ladders, ropes, or scaffolds.  The person could only occasional stoop, kneel, crouch or crawl, and could not climb stairs or ladders.  Frequent pushing and pulling with the upper and lower extremities would be allowed.  The ALJ asked the VE if this hypothetical person could perform any of the claimant's past work.  The VE responded that this person could operate the sewing machine position.  (R. 69-70).

11

The ALJ then questioned the claimant about her work as a sleeve setter.  The claimant responded that she worked at this position from age sixteen until she was twenty, and most recently held this position for three months in either 1999 or 2000.  The ALJ asked the VE whether three months was sufficient to learn how this job was performed.  The VE answered that the standard time for learning this position is six weeks.  (R. 70-71).

The ALJ next asked the VE about the allegations made by the claimant that she suffers from pain.  The ALJ answered that for vocational purposes pain is classified as mild, moderate, moderately severe, or severe, and that mild or moderate pain does not prevent work because it has no impact on concentration.  When pain exists at higher levels, according to the VE's testimony, it prevents that person from sustaining work.  The ALJ asked whether a finding that the claimant could not maintain a persistent pace for two hours at a time on a consistent basis, and had to lie down for several hours every day, would correspond with an ability for her to return to work as a sewing machine operator.  The VE stated such limitations would preclude her from performing all past work, and would also prevent her from performing any work regardless of the level of exertion required.  (R. 71-72).

The claimant's attorney questioned the VE, asking whether claimant having to miss work because of  health problems would affect her ability to maintain employment.  The VE testified that missing three or more days per month on any regular or consistent basis makes employment impossible.  (R. 72-73).

*The ALJ's Decision*

On July 31, 2008,[3] the ALJ issued a decision finding the claimant was not disabled under the Social Security Act.  (R. 23, 38).  He found that the claimant met the insured status requirements of the Social Security Act through December 31, 2010, and had not engaged in substantial gainful activity since the alleged onset date of September 18, 2006.  The ALJ found the following severe impairments: cervical radiculopathy; chronic obstructive pulmonary disease; chronic pain disorder; affective disorder with depression; and borderline intellectual functioning. He concluded, however, that the claimant did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (R. 12-20, 27-35).

The ALJ considered the claimant's allegations of disabling pain, and concluded that she did not meet the burden of proving disability under the Eleventh Circuit Court's pain standard. Upon reviewing the record, he concluded no corroborative evidence existed, medical or otherwise, to support the claimant's allegedly disabling pain and functional limitations, and no diagnostic studies revealed abnormalities that could be expected to produce severe pain.  The physical findings in the record did not establish the existence of neurological deficits, muscle atrophy, or other signs indicative of protracted pain of the intensity, frequency, and severity alleged.  The ALJ considered the claimant's allegations of disabling pain, fainting spells, depression, anxiety and numbness, but found these claims inconsistent with her daily activities, which included driving, household chores, playing computer games, watching TV, visiting her

---

[3]The record reflects that an earlier, but identical, opinion was also issued by the ALJ on July 24, 2008.

daughter, fishing, and smoking a pack of cigarettes a day.  (R. 20-22, 35-37).

The ALJ held that her subjective allegations and testimony of disabling pain and functional restrictions were disproportionate to the objective medical evidence and the totality of the record.  He noted that an MRI of the claimant's head was normal, chest x-rays were normal, x-rays of both knees were normal, and MRI scans of her lumbar and thoracic spine were both normal.  He stated that, "to the extent that the claimant's stated, subjective and/or self-serving limitations exceed those imposed upon her by competent medical professionals, the undersigned rejects the former and accepts the latter." (R. 21-22, 36-37).

The ALJ found that Dr. Whitehead's report did not demonstrate the claimant was disabled.  To reach this conclusion he relied on Dr Whitehead's Medical Source Opinion Form stating the claimant would generally have only mild to moderate psychological limitations.  (R. 21, 36).

The ALJ considered Dr. Fleece's conclusion that the claimant was not disabled, and found this opinion reasonably supported by the evidence available at that time, and also supportive of his own conclusion.  The ALJ gave little consideration to the Physical Residual Functional Capacity Assessment completed by the medical consultant, which concluded the claimant could perform a partial range of work at the light exertional level, because this assessment was not from an acceptable medical source or medical opinion entitled to controlling or great weight. (R. 22, 37).

The ALJ held that the claimant possessed the residual functional capacity to perform light work with certain limitations and restrictions.  He stated that the claimant can perform simple tasks, maintain attention and concentration for two hours at a time, and complete an eight hour

14

day with customary breaks.  He identified the following conditions that must be met in her

employment: no contact with the general pubic; only casual contact with co-workers; non-

confrontational supervision with any and all changes to the work environment fully explained

and implemented gradually; only occasional lifting and carrying of fifteen pounds; frequent

lifting and carrying of ten pounds; no more than six hours spent standing or walking during an

eight hour day; no more than six hours spent sitting during an eight hour day; no exposure to

heat, wetness, humidity, or vibration; no work near unprotected heights, or dangerous or moving

equipment; no use of ladders, ropes, or scaffolding; occasional stooping, kneeling, crouching,

crawling, and climbing of ramps and stairs; and frequent performing of push/pull actions with her

upper and lower extremities.  (R. 20-22, 35-37).

  The ALJ held the claimant was capable of performing her past relevant work as a Sewing

Machine Operator as this position did not require the performance of work-related activities

precluded by the claimant's residual functional capacity.  The ALJ accepted that the claimant

may experience "mild" or "moderate" pain, but he relied on the testimony of the Vocational

Expert that neither mild nor moderate pain would adversely affect her concentration or prevent

her from working.  (R. 22-23, 37-38).

  The ALJ concluded that the claimant was not disabled under Sections 216(I) and 223(d)

of the Social Security Act.  Based on the application for supplemental security income filed on

September 22, 2006, the ALJ also concluded that claimant was not disabled under section

1614(a)(3)(A) of the Social Security Act.  (R. 23, 38).

  On March 11, 2009, the claimant submitted additional documentation for consideration

by the Appeals Counsel, which consisted in total of a brief letter from her primary care physician

stating she is unable to work.  (R. 435).  The Appeals Counsel considered this additional

evidence, but found that it did not provide a basis for changing the ALJ's decision.  The Appeals

Counsel denied review, and the ALJ's decision became the final decisions of the Commissioner

in this case.  (R. 2-3).

The claimant appealed to this court and filed a Motion for Remand on February 4, 2010,

asserting that the Appeals Counsel failed to consider the primary treating physician's opinion,

and that remand was necessary for the ALJ to consider the additional testimony of the primary

treating physician.  (Document 8).

## VI. Discussion

### A.  Issue I

The claimant first argues that the ALJ failed to properly evaluate and consider whether

she met the requirements of listing impairment 12.05(C) and 12.05(D).

To establish a disability under 12.05(*C)*, the claimant must present evidence of a valid

verbal, performance, or full-scale I.Q. score ranging from 60-70 inclusive, and the existence of a

physical or other mental impairment imposing significant work-related limits on functioning.  20

C.F.R. Part 404, Subpart P, Appendix 1 Section 12.05(C) (1992); *Crayton v. Callahan*, 120 F.3d

1217, 1219-20 (11th Cir. 1997); *Davis v. Shalala*, 985 F.2d 528, 531 (11th Cir. 1993*)*.  When

determining whether the claimant meets or equals 12.05(C)'s second requirement, the

Commissioner must consider the combined impact of the claimant's impairments.  *Davis*, 985

F.2d at 530.

Establishing disability under Listing 12.05(*D*) requires the claimant to present evidence of

a valid verbal, performance, or full-scale I.Q. score ranging from 60-70 inclusive that results in

two of the following: (1) marked restriction of activities of daily living; or (2) marked restriction in maintaining social functioning; *or* (3) marked difficulties in maintaining concentration, persistence, or pace; or (4) repeated episodes of decompensation, each of an extended duration. 20 C.F.R. Part 404, Subpart P, Appendix 1, Section 12.05(D) (1992).

The claimant's I.Q. score need not be conclusive of mental retardation. *Lowery v. Sullivan*, 979 F.2d 835, 837 (11th Cir. 1992) (reversing the ALJ's conclusion that the claimant did not suffer from a lifelong deficit in intellectual functioning where the ALJ based this conclusion in part on the claimant having scored 81 on the verbal Wechsler Intelligence Scale for Children).  Where the claimant's score is inconsistent with other evidence in the record that weighs against finding her mentally retarded, the ALJ may properly conclude that she does not have an impairment or combination of impairments that meets or equals the requirements of 12.05(C) or (D).  *Id.*; *Popp v. Heckler*, 779 F.2d 1497, 1498-50 (11th Cir. 1986).  However, once the ALJ accepts the Claimant's I.Q. score as valid and finds that the claimant meets or equals a listed impairment, the ALJ may no longer consider the claimant's age, education or work experience to determine disability.  *Lowery*, 979 F.2d at 837.

The claimant concedes that, when tested by Dr. Whitehead, her full-scale I.Q. score was 71.  However, Dr. Whitehead specifically wrote in his report that 71 represented a possible score of 68-78.  Additionally, though the claimant's verbal I.Q. score was also 71, Dr. Whitehead wrote that this score represented a possible score of 67-77.  Dr. Whitehead concluded that the claimant had a lifelong history of mental retardation, and was currently operating at the borderline range of intellectual functioning.

17

Because the lower range of the claimant's I.Q. score dipped below 70 and because of Dr. Whitehead's conclusion that she had a history of mental retardation, the ALJ should have addressed the issue of whether she had a mental disability and analyzed her potential disability under listing 12.05.  However, in his opinion, the ALJ appears to have dismissed without consideration the possibility that the claimant's full-scale or verbal I.Q. scores satisfied the requirements of 12.05(C) or (D).  The ALJ does not reject Dr. Whitehead's opinion outright, but instead relies on Dr. Whitehead's Medical Source Opinion Form, and on Dr. Fleece's RFC to conclude the claimant only suffers from mild to moderate psychological limitations, and that these impairments do not make her disabled.  The ALJ failed to reference any portion of Dr. Whitehead's narrative psychological evaluation, in which Dr. Whitehead stated the claimant had a history of mental retardation, and appears to have also failed to consider whether the combination of the claimant's mental and physical impairments make her totally disabled.  *See Davis v. Shalala*, 985 F.2d 528, 534 (11th Cir. 1993)(mental and psychological impairments can combine with physical impairments to make the claimant totally disabled); *Bowen v. Heckler*, 748 F.2d 629, 634 (11th Cir. 1984); *Brenem v. Harris*, 621 F.2d 688, 690 (5th Cir. 1980).  The ALJ should have considered whether the evidence in the Record, including the claimant's verbal and/or full-scale I.Q. scores and the existence of other physical or mental impairments, established whether she met or equaled the requirements of 12.05(C) or (D).  Therefore, the court finds that substantial evidence does not support the ALJ's decision.

To determine whether the claimant meets or equals Listings 12.05(C) or (D), he must first find whether the claimant presents a valid I.Q. score satisfying the requirements of these sections.  To determine the validity of the claimant's I.Q. scores, the ALJ should consider that a FSIQ

score of 71 as measured by the Wechsler Adult intelligence Scale, Third Edition represents a

score ranging from 68-76, and that a VIQ score of 71 on the WAIS-III represents a score ranging

from 67-77.  The ALJ may also consider other evidence in the Record, including her level of

education and employment history, when judging the validity of her I.Q. score.  In this case, the

claimant's score is at the high end of what Sections 12.05(C) and (D) require.  It may, therefore,

be necessary to examine other evidence to determine whether the claimant meets the required

definition of mental retardation.  If the claimant's I.Q. score is inconsistent with other evidence,

it need not be accepted as conclusive of mental retardation. *Lowery*, 979 F.2d at 837; s*ee also*

*Popp*, 779 F.2d at 1499 (rejecting claim of 12.05(C) mental retardation where claimant's I.Q. of

69 was inconsistent with evidence the claimant held an associate's degree, was enrolled in a third

year of college, and had previously worked as an administrative clerk, statistical clerk, and an

algebra teacher).

　　　　When deciding whether the claimant meets listing 12.05(D), the ALJ should consider the

Psychiatric Review Technique Form completed by Dr. Fleece to determine whether her mental

impairment results in marked limitations in at least two of the four enumerated functional areas:

daily living activities; social functioning; concentration, persistence or pace; and episodes of

decompensation.  *See Moore v. Barnhart*, 405 F.3d 1208, 1213 (11th Cir. 2005)(mental

impairments evaluated using "special technique" dictated by Psychiatric Review Technique

Form, which requires separate evaluation of how the claimant's mental impairment impacts the

four enumerated functional areas).

　　　　The ALJ may also consider the results of the PRTF when determining whether the

claimant meets or equals Listing 12.05(C).  Whether the claimant experiences a marked

limitation in any of the four functional areas measured by the PRTF is not, however, conclusive. Unlike 12.05(D), which requires marked limitations in at least two functional areas, to meet Listing 12.05(C) the claimant need only demonstrate a valid I.Q. score and a physical or mental impairment that imposes an additional and significant work-related limitation.  To determine whether the second requirement of 12.05(C) is met, the ALJ should consider whether the claimant suffers a physical or mental impairment that imposes a functional limitation.  The ALJ must consider the impact of each impairment, and  must also consider the combined impact of her impairments to determine whether they impose a functional limitation.  The ALJ must consider each impairment individually and in combination before concluding whether the claimant meets or equals the 12.05(C)'s second requirement.  *Davis,* 985 F.2d at 532.

On remand, the ALJ should consider the full record, and each impairment, singularly and in combination, to determine whether the claimant meets or equals Listing 12.05(C) or 12.05(D). Having already found that the claimant suffered multiple severe impairments (cervical radiculopathy, chronic obstructive pulmonary disease, chronic pain disorder, and affective disorder with depression), the ALJ should consider whether the combination of any of these impairments with her mental impairment imposes a sufficient functional limitation to render her disabled.

**B.  The Claimant's Motion to Remand**

The claimant's motion for remand, filed on February 4, 2010, asserts that this case should be remanded because the Appeals Counsel failed to consider additional evidence consisting of a letter from her primary treating physician, Dr. Morrow.  In a letter dated March 11, 2009, Dr. Morrow stated that Ms. Franks is unable to return to work due to her medical conditions, which

he identified in the letter as Degenerative Disc Disease, Fibromyositis, Chronic Fatigue

Syndrome, and post Cervical Laminectomy and Fusion.  Because the court finds other grounds

for remanding and reversing the Commissioner's ruling, the court deems this motion to be moot.

However, to provide an alternative ruling and to provide some guidance on remand, the court

will address this issue briefly.

The Commissioner must accord considerable weight to the treating physician's testimony,

including letters and notes, unless he shows "good cause" for failing to do so.  *Crawford v.*

*Commissioner*, 363 F. 3d 1155, 1159 (11th Cir. 2004); *see also Lewis v. Callahan*, 125 F.3d

1436, 1440 (11th Cir. 1997).  However, when a treating physician's report is not accompanied by

objective medical evidence, or is wholly conclusory, the Commissioner may discount that report

or opinion.  *Crawford v. Commissioner*; *see also Edwards v. Sullivan*, 937 F.2d 580, 583 (11th

Cir. 1991).

The Record indicates that the Appeals Council received and considered Dr. Morrow's

testimony.  Furthermore, Dr. Morrow's opinion that the claimant is unable to work, as expressed

in this letter, was not accompanied by objective medical evidence or any other supporting

evidence.  (R. 2-3).   Therefore, the Appeals Council could properly find that Dr. Morrow's

opinion was wholly conclusory, and did not provide a basis for changing the ALJ's decision.

Furthermore, whether a claimant is unable to return to work is not a medical opinion entitled to

great weight; it is a question reserved for the ALJ.  Therefore, as an alternative ruling, the court

finds that the Appeals Council did not err in finding that *Dr. Morrow's letter* provided no basis

for a remand to the ALJ. The decision to reverse and remand is based on another error, as the

court previously explained.

**VII.  Conclusion**

For the reasons stated above, the court finds that substantial evidence does not support the ALJ's decision.  Therefore, in a separate order, the court will reverse the Commissioner's decision and will remand it for a determination whether the claimant is entitled to Disability Insurance Benefits or Supplemental Security Income Payments.

As to the Plaintiff's Motion to Remand (doc. 8), the court finds that motion to be MOOT in light of its determination that the case is due to be reversed and remanded on other grounds. As an alternative ruling, the court finds that the Appeals Council did not err in finding that *Dr. Morrow's letter* provided no basis for a remand to the ALJ.

DONE and ORDERED this 18th day of May, 2011.

KARON OWEN BOWDRE
UNITED STATES DISTRICT JUDGE

22